**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

NATHANIAL L. TINDEL, M.D., LLC, NATHANIAL L.
TINDEL, M.D.,[1] individually, HARRISON T. MU, M.D.,
and KEVIN HEFFERNAN,                                        5:22-cv-971 (BKS/MJK)

                                        Plaintiffs,

v.

EXCELLUS BLUE CROSS BLUE SHIELD,[2]

                                        Defendant.

---

**Appearances:**

*For Plaintiffs:*
Roy W. Breitenbach
Harris Beach, PLLC
333 W. Washington Street, Suite 200
Syracuse, NY 13202

Daniel S. Hallak
Harris Beach PLLC
333 Earle Ovington Boulevard, Suite 901
Uniondale, NY 11553

*For Defendant:*
Gwendolyn C. Payton
Sean P. Murphy
Kilpatrick Townsend & Stockton LLP
1420 5th Avenue, Suite 3700
Seattle, WA 98101

Frederick L. Whitmer
Kilpatrick Townsend & Stockton LLP
1114 Avenue of the Americas, 21st Floor
New York, NY 10036

---

[1] The caption reflects the spelling of "Nathanial" in the caption of the notice of removal. (Dkt. No. 1).

[2] As previously stated in the Court's Memorandum-Decision and Order issued on May 9, 2023, (Dkt. No. 32, at 1 n.1), it appears that the correct name of this entity is Excellus BlueCross BlueShield, which is how the Court has referred to it in this decision.

**Hon. Brenda K. Sannes, Chief United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.      INTRODUCTION

Plaintiffs Nathaniel L. Tindel, M.D., LLC, Nathaniel L. Tindel M.D., individually,

Harrison T. Mu, M.D., and Kevin Heffernan brought this action against Defendant Excellus

BlueCross BlueShield asserting claims under the Employee Retirement Income Security Act of

1974 ("ERISA"), 29 U.S.C. § 1001 et seq., and related claims under state law. (Dkt. No. 12). The

Court previously dismissed Plaintiffs' claims for unjust enrichment, tortious interference with

contractual relationship, and breach of contract as intended beneficiaries. (Dkt. No. 32).

Defendant has moved for summary judgment on Plaintiffs' remaining claims for violations of

ERISA and breach of implied-in-fact contract, (Dkt. No. 39), and Plaintiffs have cross-moved for

summary judgment on the same. (Dkt. No. 45). The motions are fully briefed. (Dkt. Nos. 39, 45,

49). For the reasons that follow, the Court grants in part and denies in part both motions.

## II.     BACKGROUND

### A.      The Summary Judgment Record

In support of its motion for summary judgment, Defendant submitted a declaration of its

counsel, Sean P. Murphy, (Dkt. No. 40), with six exhibits attached, (Dkt. No. 40-1–40-6).

Defendant failed to submit the administrative record until after Plaintiffs opposed Defendants'

motion based on the failure to attach the administrative record. (*See* Dkt. Nos. 45-5, at 8–9; *see

also* Dkt. No. 47).[3]

---

[3] Defendants and Plaintiffs have submitted two different versions of the administrative record, both under seal. (*See* Dkt. No. 45-4, at 2; Dkt. No. 47-2, at 2, 4). Defendant's version contains an additional 142 pages and 12 audio files. Plaintiffs argue that because Defendant failed to originally file the administrative record along with its motion papers and did not authenticate that what it produced to Plaintiff was the full administrative record, Defendant's motion must be denied. (Dkt. No. 45-5, at 8–9). But Plaintiffs do not cite any caselaw that suggests that in an ERISA case a defendant's failure to attach the administrative record to its motion papers is fatal to its motion. (*See id.*). While the version of the administrative record Plaintiffs filed differs from the one Defendant eventually filed, Plaintiffs appear

The six exhibits attached to counsel's affidavit are: a "copy of the 'Plan 501 Syracuse University Medical Benefits Plan,'" two transcripts of recorded calls from Dr. Tindel's practice to Defendant on August 12, 2019 and August 22, 2019, one transcript of a recorded call from Heffernan to Defendant on September 24, 2019, "a copy of an email exchange from the Syracuse University Office of Human Resources regarding . . . Heffernan's August 12, 2019 request for medical leave," and a copy of a New York Times article from September 21, 2014. (Dkt. No. 40, ¶¶ 1–7). Plaintiffs argue that "[a]side from the New York Times article, none of the other pieces of 'evidence' have been properly authenticated in compliance with Fed. R. Evid. 901," and that "[t]he transcripts that [Defendant] seek [sic] to offer" are not admissible under the Best Evidence Rule, Rule 1002 of the Federal Rules of Evidence, "because the underlying audio recordings from which they were purportedly made have not been filed, produced, or authenticated." (Dkt. No. 45-5, at 9–10). Defendant contests that it was required to authenticate its evidence and argues that the transcripts were properly authenticated and produced.  (Dkt. No. 49, at 6 n.5, 12 n.7).

"At summary judgment, 'records may be properly considered in the absence of any reasons shown to suggest that they are not genuine.'" *Thieriot v. Laggner*, No. 23-cv-1875, 2024 WL 3862086, at *6, 2024 U.S. Dist. LEXIS 148829, at *17 (S.D.N.Y. Aug. 14, 2024) (slip copy) (citation omitted). The Second Circuit has stated that "[t]he bar for authentication of evidence is not particularly high" and that "[g]enerally, a document is properly authenticated if a reasonable juror could find in favor of authenticity." *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir.

---

to have had access to the full administrative record at the time they filed their cross-motion for summary judgment, (*see* Dkt. No. 45-2 (citing documents referred to at Dkt. No. 47-2, at 2, 4); Dkt. No. 53 (declaration from Defendant's counsel explaining that the recordings in the administrative record were produced to Plaintiffs on July 17, 2023)), and Plaintiffs do not make any specific objections to its accuracy. Additionally, the administrative record has subsequently been filed by Defendant. (*See* Dkt. No. 47-2, at 2, 4).  The Court will therefore not reject Defendant's motion for summary judgment on this basis.

2007). "The burden of authentication does not require the proponent of the evidence to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be. Rather, the standard for authentication, and hence for admissibility, is one of reasonable likelihood." *United States v. Pluta*, 176 F.3d 43, 49 (2d Cir. 1999) (citation omitted). And on summary judgment, "while the content of the evidence submitted to support or dispute a fact must be admissible, 'the material may be presented in a form that would not, in itself, be admissible at trial.'" *Harig v. City of Buffalo*, 574 F. Supp. 3d 163, 174 (W.D.N.Y. 2021) (quoting *Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017)), *aff'd* 2023 WL 3579367, 2023 U.S. App. LEXIS 12463 (2d Cir. May 22, 2023); *see also* Fed. R. Civ. Pro. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").

Plaintiffs do not suggest any reason to believe the exhibits are not genuine. (*See* Dkt. No. 45-5, at 9). Defendant has also filed the underlying recordings upon which the three transcripts were based with both the Court and with Plaintiffs. (*See* September 24, 2019 Recording; Dkt. No. 51; Dkt. No. 53, ¶¶ 2, 4).[4] Plaintiffs were provided an opportunity to address the audio recordings and did not oppose the accuracy of the transcripts. (*See* Dkt. Nos. 52, 54). Accordingly, the Court does not decline to consider Defendant's exhibits on the grounds that they are not properly authenticated or inadmissible.

---

[4] Defendant has filed 12 audio recordings as part of the administrative record, with file names corresponding to R. 476–87. Only one of the transcripts corresponded to a recording in the administrative record. (*See* R. 487; September 24, 2019 Recording; Dkt. No. 40, ¶ 6; Dkt. No. 40-5). The other two audio recordings corresponding to the filed transcripts were provided to the Court and Plaintiffs after Defendant submitted its reply brief. (*See* Dkt. No. 49; Dkt. No. 51; Dkt. No. 53, ¶ 4). The Court has considered the transcripts as an aid in interpreting the audio recordings.

B.      **FACTS**[5]

1.      **The Parties**

Kevin Heffernan is a beneficiary of the Syracuse University Medical Benefits Plan (the

"Plan"),[6] an employee benefits plan governed by ERISA. (Dkt. No. 39-2, ¶ 1; Dkt. No. 45-2, ¶ 1;

*see* Dkt. No. 45-1, ¶ 1; Dkt. No. 49-1, ¶ 1). Nathaniel L. Tindel, M.D. ("Dr. Tindel") is an

orthopedic surgeon, Harrison T. Mu, M.D ("Dr. Mu") is a neurosurgeon, and Nathaniel L. Tindel

M.D., LLC is Dr. Tindel's private practice. (Dkt. No. 39-2, ¶ 2; Dkt. No. 45-2, ¶¶ 3–5; *see* Dkt.

No. 45-1, ¶ 2; Dkt. No. 49-2, ¶¶ 3–5). Defendant is a health-care services contractor and the

third-party administrator of the Plan. (Dkt. No. 39-2, ¶ 1; Dkt. No. 45-2, ¶ 2; *see* Dkt. No. 45-1, ¶

1; Dkt. No. 49-2, ¶ 2).

2.      **Relevant Plan Provisions**

Section 3.1 of the Plan states that "[b]enefits under the Plan, eligibility requirements,

effective dates of coverage and termination, and related provisions shall, to the extent not already

addressed in the Plan, be determined by the terms of the documents, contracts, booklets, and/or

other materials described in" Appendices A, B, and C, "which are hereby incorporated by

reference and made a part of this Plan." (Dkt. No. 40-1, at 10; *see also* Dkt. No. 39-2, ¶ 3; Dkt.

No. 45-1, ¶ 3; Dkt. No. 45-2, ¶ 6; Dkt. No. 49-1, ¶ 6). Appendix A, titled "Medical Documents,"

incorporates by reference as part of the Plan a "medical booklet," which is part of the "Summary

_____

[5] The facts are drawn from the parties' statements of material facts, (Dkt. No. 39-2; Dkt. No. 45-2), and responses to
statements of material facts, (Dkt. No. 45-1; Dkt. No. 49-1), to the extent the facts are well-supported by pinpoint
citations to the record, as well as the exhibits attached thereto and cited therein. With respect to any audio recordings
referenced, the Court cites the audio recordings themselves, rather than the transcripts provided.  When citing the
administrative record, the Court refers to the document indicated at Dkt. No. 47-2, at 2, as "R," and the document
indicated at Dkt. No. 47-2, at 4 as "Pl. R." The facts are construed in favor of the non-moving party on an issue. *See
Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

[6] The Plan provides three coverage options—SUBlue, SUOrange, and SUPro. (*See* R. 73). The administrative record
indicates that Plaintiff receives benefits under the SUBlue option. (*See, e.g.*, R. 12, 31, 35, 40). The Court accordingly
outlines the Plan's SUBlue coverage and benefits.

Plan Description" ("SPD"). (Dkt. No. 40-1, at 21; R. 75; *see also* Dkt. No. 39-2, ¶¶ 3–4; Dkt. No. 45-1, ¶¶ 3–4; Dkt. No. 45-2, ¶¶ 6–8; Dkt. No. 49-1, ¶¶ 6–8). The SPD "describes certain provisions of the Syracuse University Medical Benefits Plan" and "the Plan rights and benefits for covered Employees." (R. 75; *see also* Dkt. No. 39-2, ¶ 4; Dkt. No. 45-1, ¶ 4; Dkt. No. 45-2, ¶ 9; Dkt. No. 49-1, ¶ 9). The SPD has various parts which "[e]xplain[] when the benefit applies and the types of charges covered," "[s]how[] what charges are not covered," and "[e]xplain[] the rules for filing claims and the claim appeal process." (R. 75; *see also* Dkt. No. 39-2, ¶ 4; Dkt. No. 45-1, ¶ 4; Dkt. No. 45-2, ¶ 9; Dkt. No. 49-1, ¶ 9).

The SPD states that "[b]enefits under this Plan shall be paid only if the Claims Administrator decides in its discretion that a Covered Person is entitled to them." (R. 127; *see also* Dkt. No. 39-2, ¶ 5; Dkt. No. 45-1, ¶ 5). The Claims Administrator is Excellus Health Plan, Inc. (R. 128). The Plan also allows for claim or partial claim denials—i.e., an "Adverse Benefit Determination"—to be reconsidered through an internal appeals process, consisting of up to three steps. (R. 128, 132–135). The SPD states that "[i]n general, should you wish to Appeal an Adverse Benefit Determination, you must first commence a Step One Appeal." (R. 132). The claimant has 180 days from an Adverse Benefit Determination to make a Step One Appeal. (R. 133). If the Step One Appeal is denied, a claimant wishing to continue the internal appeals process must make a Step Two Appeal within 90 days. (R. 134). Finally, a claimant may choose to pursue a Step Three Appeal if his Step Two Appeal is denied. (R. 134). This appeal must be submitted within 90 days and is reviewed by the University's Administrative Benefits Committee. (R. 133, 134). The SPD specifies that "[t]he Plan Administrator has delegated authority and responsibility for deciding initial Claims and Step One and Step Two internal

appeals to Excellus Health Plan, Inc. for medical claims." (R. 128; *see also* Dkt. No. 39-2, ¶ 5; Dkt. No. 45-1, ¶ 5).

The SPD also contains the following language: "[y]ou may not assign your right to take legal action under this Plan to any Provider of service. Direct payments to a Provider, physician or Hospital do not constitute a waiver of this anti-assignment provision." (R. 127).

With respect to the availability of out-of-network benefits, the SPD states:

> Out-of-Network Benefits will be paid for services rendered by Out-of-Network Providers. Out-of-Network Providers are Provider's [sic] that have not entered into a contract with the Claims Administrator or another Blue Cross Blue Shield plan to provide services to Covered Persons. Out-of-Network Providers are not required to accept the Plan's payment of the Allowed Charge, as payment in full, after you pay any applicable Coinsurance, Copayment and/or Deductible as shown in the Appendices – Schedule of Benefits section of this booklet. You are also responsible for payment of any difference between the Allowed Charge and the Provider's actual charge.

(R. 84–85; *see also* Dkt. No. 39-2, ¶ 7; Dkt. No. 45-1, ¶ 7; Dkt. No. 45-2, ¶ 10; Dkt. No. 49-1, ¶ 10). Under the SPD there is greater coverage for certain emergency services provided by out-of-network providers. The SPD defines "Allowed Charge" as:

> [T]he maximum amount the Plan will pay for the services or supplies covered under this Plan, before any applicable Copayment, Deductible and/or Coinsurance amounts are subtracted.
> . . .
> The Allowed Charge for Out-of-Network Providers will be determined as follows:
> . . .
> For Facilities outside the Service Area, the Allowed Charge will be the lesser of: (a) 150% of the Centers for Medicare and Medicaid Services Prospective Payment System (MMSPPS) amount unadjusted for geographic locality, (b) the Facility's charge or (c) a Blue Cross Blue Shield host plan's rate.
> If there is no MMSPPS amount as described above, the Allowed Charge will be the lesser of: (a) 75% of the Facility's charge or (b) a Blue Cross Blue Shield host plan's rate.
> . . .

> The Allowed Charge for an Out-of-Network Provider for Emergency Services and ambulance services for an Emergency Medical Condition will be the Out-of-Network Provider's charge. You are responsible for any Copayment, Deductible and/or Coinsurance.

(R. 109–10; *see also* Dkt. No. 39-2, ¶ 8; Dkt. No. 45-1, ¶ 8; Dkt. No. 45-2, ¶ 11; Dkt. No. 49-1, ¶ 11).

The general percentage coinsurance for benefits for out-of-network services is provided in the Schedule of Benefits as follows: "[t]he covered person pays 30% of the Allowed Charge after any Deductible and/or Copayment for most Covered Services and Supplies. The Plan pays 70% of the Allowed Charge. The Covered Person is also responsible for the difference between the Provider's actual charge and the Allowed Charge." (R. 159; *see also* Dkt. No. 45-2, ¶ 13; Dkt. No. 49-1, ¶ 13).

The SPD defines an Emergency Medical Condition as the following:

> [A] serious medical condition or behavioral condition after the onset of acute symptoms that were sudden and of such severity and/or pain that a prudent layperson, possessing an average knowledge of medicine and health could reasonably expect that the absence of immediate medical attention to result in placing the person in serious jeopardy (including the health of a pregnant woman or her unborn child) or others, if severe behavioral condition; impairment to bodily function; dysfunction of any organ; or serious disfigurement.

(R. 112; *see also* Dkt. No. 39-2, ¶ 11; Dkt. No. 45-1, ¶ 11; Dkt. No. 45-2, ¶ 14; Dkt. No. 49-1, ¶ 14). It further defines Emergency Services as the following:

> [A] medical screening examination (as required under Section 1867 of the Social Security Act (EMTALA)) within the capability of the Hospital emergency department, including routine ancillary services to evaluate an Emergency Medical Condition and such further medical examination and treatment as are within the capabilities of the staff and facilities of the Hospital and required under EMTALA to stabilize the patient.

(R. 112; *see also* Dkt. No. 39-2, ¶ 12; Dkt. No. 45-1, ¶ 12; Dkt. No. 45-2, ¶ 15; Dkt. No. 49-1, ¶ 15).

### 3.   Heffernan's August 21, 2019 Surgery and Lead-up

Heffernan reported that he went to the "Crouse ER" on July 10, 2019. (*See* September 24, 2019 Recording, at 1:10-1:24). Heffernan described his experience regarding the events preceding and following his emergency room visit as follows:

> I had woken up a few days earlier with pain between my shoulder blades, and the pain progressed over two days to the point when I woke up on the Tenth, the pain was ten out of ten. The pain was radiating down my arm. My arm was slightly numb and tingling. . . . So I went to the emergency room and said I have pain between my shoulder blades radiating down my right arm. My right arm is numb and tingling. And long story short, from that initial visit, I ended up having emergency surgery one month later for pretty severe cervical spine stenosis. I received an anterior decompression and fusion from C4 to C7 in the front. I received a laminectomy from C3 to C7 in the back. And I was told separately by three surgeons that if I didn't have that emergency surgery, I was looking at paralysis, loss of limbs, loss of bladder control, foot drop, loss of balance for the rest of my life. . . . That initial ER visit basically led to an eight hour surgical procedure about a month later.

(*Id.* at 9:44-11:21).

Heffernan consulted with Dr. Tindel on August 12, 2019, prior to his surgery. (Dkt. No. 39-2, ¶ 17; Dkt. No. 45-1, ¶ 17; *see also* R. 65; August 12, 2019 Recording). Heffernan checked into Lenox Hill Hospital's emergency room and was admitted on August 20, 2019. (Dkt. No. 39-2, ¶ 18; *see* Dkt. No. 45-1, ¶ 18). Dr. Tindel, assisted by Dr. Mu, performed surgery on Heffernan the following day. (*See* R. 239–44; *see also* Dkt. No. 39-2, ¶ 18; Dkt. No. 45-1, ¶ 18; Dkt. No. 45-2, ¶ 20; Dkt. No. 49-1, ¶ 20).

Dr. Tindel wrote the following in his operative report under "indications":

> This is a 40-year-old male who presented to the emergency room at Lenox Hill Hospital with acute and rapidly progressive bilateral upper extremity weakness and atrophy and cervical myelopathy due

to spinal cord compression. Of particular concern is the acute onset of gait disturbance and balance difficulty. The patient has already been evaluated in another emergency room for the severity of his symptoms. He had been advised of the need for surgery by two independent surgeons. Last week he became acutely unsteady after he tilted his head up at which time he lost his balance, stumbled and fell forward, and hit his head on a refrigerator.

(R. 240; *see also* Dkt. No. 45-2, ¶ 17; Dkt. No. 49, ¶ 17)

### 4.    Calls Between Nathaniel L. Tindel, M.D., LLC and Defendant

Staff at Dr. Tindel's practice had conversations with Defendant's representatives regarding Heffernan on August 12 and August 22, 2019. (*See* Dkt. No. 40, ¶¶ 3, 5; *see also* August 12, 2019 Recording; August 22, 2019 Recording). The August 12, 2019 call took place between "Melissa" from Dr. Tindel's office, and two representatives of Defendant, "Joanne" and "Bridget." (*See* Dkt. No. 40, ¶ 3; August 12, 2019 Recording). Melissa stated she was calling "to verify a patient's eligibility for out-of-network," and specified the patient was Heffernan. (August 12 Recording, at 0:20–0:25, 1:21–1:26). She was told that "[f]or his out-of-network benefits for a diagnostic office visit, it's going to be subject to the out-of-network deductible, $300.00. And then once that deductible is met, then we'll reimburse 70% of the allowed amount and member will have a 30% coinsurance." (*Id.* at 3:23–3:48). Later in the call, Melissa and Bridget had the following exchange regarding reimbursement rates:

> Melissa: Can you tell me if this is usual and customary based on FAIR Health?[7]
> Bridget: Uh yes, through um uh yes through FAIR Health.
> Melissa: What percentage?
> Bridget: So after the deductible, we'll reimburse 70% of the allowed amount, and then after the out-of-pocket is met, which is 6000 for out-of-network, then we'll consider covering 100% of the allowed amount.
> Melissa: But it's usual and customary?

---

[7] Plaintiffs assert that there is a usual and customary rate "used by health plans for out-of-network reimbursement" that is determined with "benchmarking databases maintained by FAIR Health." (*See* Dkt. No. 25, at 11 n.2).

Bridget: Right.

(*Id.* at 5:48–6:28).

The August 22, 2019 call took place between "Naomi" from Dr. Tindel's office, and two representatives of Defendant, "Ashley" and "Dave." (*See* Dkt. No. 40, ¶ 5; August 22, 2019 Recording). Naomi explained that Dr. Tindel had operated on Heffernan the day prior and that she "got a pending case number from the hospital" and "just wanted to reconfirm [Heffernan's] benefits also and all that stuff." (August 22, 2019 Recording, at 0:11–0:40). Naomi was told that the authorization was "currently pending." (*See id.* at 4:15–4:54). Naomi asked to verify that "the out-of-network reimbursement" would "be based on the local BlueCross BlueShield plan," and was told that the "[p]ricing file for professional out of area out-of-network states it is the lesser of 150% of the Medicare allowed charge or 100% of the billed charge." (*See id.* at 9:28–10:23). Naomi and Dave discussed that on the August 12, 2019 call, another of Defendant's representatives indicated Heffernan's policy would cover 70% of the usual and customary rate for "out-of-network," and Dave confirmed that Heffernan's policy did not provide coverage for "[p]rofessional healthcare out of area out-of-network" at that rate. (*See id.* at 15:34–19:41).

### 5. Claims, Denials, and Subsequent Appeals

Dr. Mu submitted claims to Defendant for an amount totaling $241,655.00 on August 21, 2019. (Pl. R. 99–101; *see also* Dkt. No. 39-2, ¶ 21; Dkt. No. 45-1, ¶ 21; Dkt. No. 45-2, ¶ 21; Dkt. No. 49-1, ¶ 21). Dr. Tindel submitted claims to Defendant totaling $114,875 for the surgery and $950 for the office consultation on September 10, 2019, and September 12, 2019, respectively. (Pl. R. 61–62; *see also* Dkt. No. 39-2, ¶ 22; Dkt. No. 45-1, ¶ 22; Dkt. No. 45-2, ¶¶ 22–23; Dkt. No. 49-1, ¶¶ 22–23). The total billed charges amount to $357,480. (Dkt. No. 39-2, ¶ 23; *see* Dkt. No. 45-1, ¶ 23).

Defendant issued Explanations of Benefits ("EOBs") and reimbursements based on the submitted charges. (Dkt. No. 39-2, ¶ 27; Dkt. No. 45-2, ¶ 27; Dkt. No. 45-2, ¶ 25; Dkt. No. 49-1, ¶ 25). First, Defendant reimbursed Heffernan $249.13 for the August 20, 2019 consultation with Dr. Tindel. (*See* R. 404–11; *see also* Dkt. No. 39-2, ¶ 27; Dkt. No. 45-1, ¶ 27; Dkt. No. 45-2, ¶ 25; Dkt. No. 49-1, ¶ 25). Out of the $950 charged, the allowed amount was determined to be $299.13 and Heffernan was assessed a $50 copay. (R. 406; *see also* Dkt. No. 39-2, ¶ 27; Dkt. No. 45-1, ¶ 27; Dkt. No. 45-2, ¶ 25; Dkt. No. 49-1, ¶ 25). Second, Defendant reimbursed Heffernan $3,126.82 for Dr. Tindel's surgery services. (*See* R. 390–97; *see also* Dkt. No. 39-2, ¶ 27; Dkt. No. 45-1, ¶ 27; Dkt. No. 45-2, ¶ 25; Dkt. No. 49-1, ¶ 25). Out of the $114,875 charged, the allowed amount was determined to be $4,466.87 and Heffernan was assessed a $1,340.05 coinsurance. (R. 392; *see also* Dkt. No. 39-2, ¶ 27; Dkt. No. 45-1, ¶ 27; Dkt. No. 45-2, ¶ 25; Dkt. No. 49-1, ¶ 25). Third, Defendant reimbursed Heffernan for the $1,332.74 for Dr. Mu's assistant surgeon services. (*See* R. 374–81; *see also* Dkt. No. 39-2, ¶ 27; Dkt. No. 45-1, ¶ 27; Dkt. No. 45-2, ¶ 25; Dkt. No. 49-1, ¶ 25). Out of the $241,655 charged, the allowed amount was determined to be $1,903.85, and Heffernan was assessed a $571.11 coinsurance. (R. 376; *see also* Dkt. No. 39-2, ¶ 27; Dkt. No. 45-1, ¶ 27; Dkt. No. 45-2, ¶ 26; Dkt. No. 49-1, ¶ 26).

Dr. Mu sent Empire BCBS a "First Level Member Appeal" through counsel in a letter dated March 20, 2020. (Pl. R. 72–87; *see also* Dkt. No. 39-2, ¶ 28; Dkt. No. 45-1, ¶ 28, Dkt. No. 45-2, ¶ 28; Dkt. No. 49-1, ¶ 28). It stated that Dr. Mu was "the assignee and designated authorized representative of Mr. Heffernan." (Pl. R. 73). Dr. Tindel also sent a "first level member appeal" to Defendant dated March 27, 2020, in which he stated the appeal was "on behalf of Kevin Heffernan." (Pl. R. 24–28; *see also* Dkt. No. 39-2, ¶ 28; Dkt. No. 45-1, ¶ 28, Dkt. No. 45-2, ¶ 29; Dkt. No. 49-1, ¶ 29). Both appeals noted the emergency nature of the

procedure, argued that they were not sufficiently reimbursed, and that the explanation provided by Defendant was insufficient. (Pl. R. 24–28, 72–87; *see also* Dkt. No. 39-2, ¶ 28; Dkt. No. 45-1, ¶ 28, Dkt. No. 45-2, ¶ 30; Dkt. No. 49-1, ¶ 30).

Defendant sent Heffernan a "Notice of Adverse Benefit Determination – Step 1 Contractual Appeal" on April 21, 2020, upholding its previous determination of benefits regarding surgery, assistant surgery, and anesthesia services (R. 30; *see also* Dkt. No. 39-2, ¶ 29; Dkt. No. 45-1, ¶ 29; Dkt. No. 45-2, ¶ 31; Dkt. No. 49-1, ¶ 31). The Notice stated that "[i]n making the decision, Excellus reviewed and considered all relevant documents, records, and other information . . . in making the initial benefit determination, as well as any additional materials submitted for consideration with the appeal." (R. 30). Defendant provided the following explanation of its decision:

> According to your plan, covered surgery, assistant surgeon and anesthesia services when rendered by out-of-network providers are paid at 70% of the allowable expense amount once the $300.00 single out-of-network deductible is satisfied in a calendar year. Once the out-of-network calendar year deductible is satisfied the member financial responsibility is the 30% coinsurance of the allowable expense amount and balance bill if applicable. Once the $6,000.00 single out-of-network annual out-of-pocket maximum is satisfied covered out-of-network services are paid at 100% of the allowable expense amount for the remainder of the calendar year and the member financial responsibility is the balance bill if applicable.
>
> This is indicated in your Syracuse University Medical Benefits Booklet:
>
> - Comprehensive Medical Benefits – Out-of-Network Benefits
> - Appendix A, Schedule of Benefits – SUBlue, Surgery, Assistant Surgeon, Anesthesia
>
> I have verified Dr. Nathaniel L. Tindel Dr. Harrison T. Mu and Dr. Sudhir A. Diwan are out-of-network providers. I have also verified the out-of-network calendar year deductible was satisfied when these claims processed and so a payment was made by us. You

> remain financially responsible for the coinsurance and balance bill amounts.
>
> I understand your grievance for additional payment on the above out-of-network services because you are liable up to charge. Please know it is difficult to give unfavorable responses. The above claims are processed with the correct allowable expense amount based on the lesser of the amount provided by the providers [sic] local Blue Cross Blue Shield Plan or 150% of the Medicare fee schedule amount.
>
> In making this decision to uphold the initial denial of the requested treatment or service, Excellus relied on the aforementioned provisions of the Plan.

(R. 30–31; *see also* Dkt. No. 39-2, ¶ 29; Dkt. No. 45-1, ¶ 29).

Dr. Mu sent a "second level member appeal," dated June 10, 2020, to Defendant, again through counsel. (Pl. R. 102–10; *see also* Dkt. No. 45-2, ¶ 32; Dkt. No. 49-1, ¶ 32). Dr. Mu reasserted and elaborated upon the same arguments he made in his previous appeal, noting the emergency nature of the procedure, arguing that he was not sufficiently reimbursed, and that the explanation provided by Defendant was insufficient. (Pl. R. 103–10; *see also* Dkt. No. 45-2, ¶ 32; Dkt. No. 49-1, ¶ 32). On July 6, 2020, Defendant issued a "Notice of Adverse Benefit Determination – Step Two Contractual Appeal," to Heffernan, again upholding its determination under substantively the same reasoning. (*See* R. 35–37; *see also* Dkt. No. 39-2, ¶ 30; Dkt. No. 45-1, ¶ 30; Dkt. No. 45-2, ¶¶ 33–34; Dkt. No. 49-1, ¶¶ 33–34). The determination did not address the argument regarding the emergency nature of the services provided. (*See* R. 35–37).

Dr. Tindel sent a "step-two member appeal" to Defendant dated July 12, 2020. (Pl. R. 29–33; *see also* Dkt. No. 39-2, ¶ 31; Dkt. No. 45-1, ¶ 31; Dkt. No. 45-2, ¶ 35; Dkt. No. 49-1, ¶ 35). The appeal elaborated on the emergency nature of the surgery and reiterated other aspects of his original appeal. (R. 29–33; *see also* Dkt. No. 39-2, ¶ 31; Dkt. No. 45-1, ¶ 31; Dkt. No. 45-2, ¶¶ 35–36; Dkt. No. 49-1, ¶¶ 35–36). On August 14, 2020, Defendant sent an "Acknowledgment

of Request for Review" to Heffernan stating "[y]our provider recently requested, verbally or in writing, a review of our determination regarding the service(s) referenced above" and that Defendant "already reviewed the determination at the request of another qualified party." (R. 29; *see also* Dkt. No. 39-2, ¶ 32; Dkt. No. 45-1, ¶ 32; Dkt. No. 45-2, ¶ 37; Dkt. No. 49-1, ¶ 37).[8] Dr. Tindel sent a "Second Level Member Appeal" dated September 1, 2021, to Defendant through counsel, articulating substantively similar issues as those detailed in Dr. Tindel's previous appeals. (*See* R. 339–61; *see also* Dkt. No. 39-2, ¶ 33; Dkt. No. 45-1, ¶ 33; Dkt. No. 45-2, ¶ 38; Dkt. No. 49-1, ¶ 38). Defendant sent Heffernan a letter dated October 8, 2021, stating that Dr. Tindel's step two appeal was untimely. (R. 24; *see also* Dkt. No. 39-2, ¶ 34; Dkt. No. 45-1, ¶ 34; Dkt. No. 45-2, ¶ 40; Dkt. No. 49-1, ¶ 40).

Defendant also sent Heffernan a "Notice of Adverse Benefit Determination – Step One Internal Appeal,"[9] dated October 1, 2021, regarding Defendant's determination of the reimbursement rate for the office consultation on August 20, 2019. (R. 12–14; *see also* Dkt. No. 39-2, ¶ 34; Dkt. No. 45-1, ¶ 34; Dkt. No. 45-2, ¶ 39; Dkt. No. 49-1, ¶ 39). This letter upheld Defendant's original determination, and explained its decision as follows:

> According to the Plan, out-of-network emergency room services when provided by a physician is a $50 copayment once the $100 individual deductible is satisfied in a calendar year, and balance billing if applicable. The allowable expense means the maximum amount we will pay to a provider before any applicable deductible, coinsurance and copayment amounts have been subtracted. When you receive services rendered by an out of-network provider, you will be responsible for paying the difference between the allowable expense and the provider's charge.

---

[8] The letter refers to "Harrison Mu" as the provider, but the timing suggests that the letter relates to Dr. Tindel's step two appeal. (*See* R. 29).

[9] The administrative record does not appear to contain the original step one appeal request regarding this benefit determination.

> This is indicated in your Syracuse University Medical Benefits Booklet:
>
> - Comprehensive Medical Benefits – Out-of-Network Benefits
> - Appendix A, Schedule of Benefits – SUBlue, Hospital Outpatient Care Services, Emergency Room
>
> I have verified Dr. Nathaniel Tindel is an out-of-network provider. I have also verified your deductible was met at the time the claim was adjudicated. Therefore, the claim processed correctly and you remain financially responsible for the applicable copayment applied as well as the difference between the allowable expense and the provider's charge.
> . . .
>
> In making the decision to uphold the initial denial of the requested treatment or service, Excellus relied on the aforementioned provision of the Plan.

(R. 12–13). The determination refers twice to the emergency nature of the procedure but does not explain why the procedure does not qualify as an "Emergency Service" in accordance with the SDP. (*See id.*).

## III.    STANDARD OF REVIEW

Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248).

Where, as here, both parties have filed motions for summary judgment, "the court must evaluate each party's motion on its own merits." *Heublein, Inc. v. United States*, 996 F.2d 1455,

1461 (2d Cir. 1993) (quoting *Schwabenbauer v. Bd. of Educ. of Olean*, 667 F.2d 305, 314 (2d

Cir. 1981)). The moving party bears the initial burden of "demonstrat[ing] the absence of a

genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving

party may meet this burden by showing that the nonmoving party has "'fail[ed] to make a

showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." *Id.* at 322; *see also Selevan v. N.Y.*

*Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is

appropriate where the nonmoving party has "'failed to come forth with evidence sufficient to

permit a reasonable juror to return a verdict in his or her favor on' an essential element of a

claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))). If the

moving party meets this burden, the nonmoving party "must set forth specific facts showing that

there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Wright v. Goord*, 554

F.3d 255, 266 (2d Cir. 2009). In ruling on a motion for summary judgment, "[t]he role of the

court is not to resolve disputed issues of fact but to assess whether there are any factual issues to

be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Wilson v. NW Mut. Ins.*

*Co.*, 625 F.3d 54, 60 (2d Cir. 2010)).

   "When ruling on a summary judgment motion, the district court must construe the facts

in the light most favorable to the non-moving party and must resolve all ambiguities and draw all

reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d

775, 780 (2d Cir. 2003) (citing *Anderson*, 477 U.S. at 255). Still, the nonmoving party "must do

more than simply show that there is some metaphysical doubt as to the material facts,"

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot "rely

on mere speculation or conjecture as to the true nature of the facts to overcome a motion for

summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## IV.   DISCUSSION

### A.   Statutory Standing

Defendant contends that the Plan's anti-assignment provision bars the Provider Plaintiffs' claims under ERISA, and that Plaintiffs have not met their burden to show the bar is unenforceable. (Dkt. No. 39-1, at 3–8). Plaintiffs respond, arguing that the anti-assignment clause should not be considered, or, if considered, not enforced. (Dkt. No. 45-5, at 17–18).

"Section 502(a)(1)(B) of ERISA authorizes health plan participants and beneficiaries to bring civil enforcement actions to recover plan benefits." *Simon v. Gen. Elec. Co.*, 263 F.3d 176, 177 (2d Cir. 2001) (per curiam) (citing 29 U.S.C. § 1132(a)(1)(B)).[10] "Generally, § 502(a) is narrowly construed to permit only the enumerated parties to sue directly for relief." *Montefiore Med. Ctr. v. Teamsters Local 272*, 642 F.3d 321, 329 (2d Cir. 2011) (citing *Franchise Tax Bd. v. Constr. Vacation Trust for S. Cal.*, 463 U.S. 1, 27 (1983)). But the Second Circuit has "'carv[ed] out a narrow exception to the ERISA standing requirements' to grant standing 'to healthcare providers to whom a beneficiary has assigned his claim in exchange for health care.'" *Id.* (quoting *Simon*, 263 F.3d at 178)). "In order for an assignee to prevail on an ERISA claim . . . the assignee must establish the existence of a valid assignment that comports with the terms of

---

[10] 29 U.S.C. § 1002(7) defines participant as, in relevant part, "any employee . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization." 29 U.S.C. § 1002(8) defines beneficiary as "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder."

the welfare benefits plan." *Neuroaxis Neurological Assocs. v. Costco Wholesale Co.*, 919 F.

Supp. 2d 345, 351 (S.D.N.Y. 2013). "However, plaintiffs do not have standing to bring claims

under ERISA plans that contain express anti-assignment provisions." *Mbody Minimally Invasive*

*Surgery, P.C. v. Empire Healthchoice HMO, Inc.*, No. 13-cv-6551, 2014 WL 4058321, at *3,

2014 U.S. Dist. LEXIS 114012, at *7 (S.D.N.Y. Aug. 15, 2014).

"In determining whether contract language prohibits assignment to a healthcare provider,

courts apply traditional principles of contract interpretation. . . . [A] court must not rewrite, under

the guise of interpretation, a term of the contract when the term is clear and unambiguous."

*Neuroaxis Neurological Assocs.*, 919 F. Supp. 2d at 352 (citations omitted). "Language in a plan

is ambiguous when it is capable of more than one meaning when viewed objectively by a

reasonably intelligent person who has examined the context of the entire . . . agreement."

*Critchlow v. First UNUM Life Ins. Co. of Am.*, 378 F.3d 246, 256 (2d Cir. 2004) (internal

quotation marks omitted) (quoting *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002)).

Here, the Provider Plaintiffs indicate that they are pursuing their claims as Plaintiff

Heffernan's assignees. (*See, e.g.*, Dkt. No. 45-5, at 7). However, the Plan contains an anti-

assignment provision stating that "[y]ou may not assign your right to take legal action under this

Plan to any Provider of service. Direct payments to a Provider, physician or Hospital do not

constitute a waiver of this anti-assignment provision." (R. 127).

Plaintiffs argue that the Defendant cannot rely on the anti-assignment provision because

it was contained in the SPD which was not attached to its motion papers. (Dkt. No. 45-5, at 17).

As Plaintiffs cite no relevant case law in support of this argument, (*see id.*), the Court finds this

argument without merit.[11] Plaintiffs also characterize the provision as "ambiguous and hidden in

---

[11] Plaintiffs do cite the decision on the motion to dismiss in this case, in which the Court did not consider the SPD at that stage, under the standard for when it is appropriate to consider documents not attached to a complaint. (*See* Dkt.

an obscure section of the SPD."[12] (*See id.* at 18). But Plaintiffs do not point to any language in the provision that is subject to multiple meanings, *see Critchlow*, 378 F.3d at 256. The Court finds that the provision "unqualifiedly and unambiguously bar[s] a Plan member or beneficiary from assigning his right to sue to an out-of-network provider or anyone else." *Neurological Surgery, P.C. v. Travelers Co.*, 243 F. Supp. 3d 318, 329–30 (E.D.N.Y. 2017) (finding provisions in ERISA plan, including one stating "you may not assign, convey, or in any way transfer your right to bring a lawsuit to anyone else," to unambiguously bar assignment of legal claims).

Even "[i]n the face of an unambiguous anti-assignment clause, some courts have held that an assignee plaintiff may still have ERISA standing if the benefits administrator either waived or is estopped from relying on that provision." *Redstone v. Empire Healthchoice HMO, Inc.*, No. 23-cv-2077, 2024 WL 967416, at *3, 2024 U.S. Dist. LEXIS 38467, at *8 (S.D.N.Y. Mar. 5, 2024). "Waiver arises when a party has voluntarily or intentionally relinquished a known right," *Merrick v. UnitedHealth Grp. Inc.*, 175 F. Supp. 3d 110, 122 (S.D.N.Y. 2016) (quoting *Ludwig v. NYNEX Serv. Co.*, 838 F. Supp. 769, 796 (S.D.N.Y. 1993)); *see also Redstone*, 2024 WL 967416, at *3, 2024 U.S. Dist. LEXIS 38467, at *8 ("Waiver requires a clear manifestation of an intent to waive the provision." (quoting *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 585 (2d Cir. 2006))). "To prevail on an estoppel claim under ERISA, [Plaintiffs] must prove (1) a promise, (2) reliance on the promise, (3) injury caused by the reliance, and (4) an injustice if the promise is not enforced, and must adduce [ ] . . . facts

---

No. 32, at 5–7, 9). This is entirely irrelevant to whether the Court may consider the SPD now, on a motion for summary judgment.

[12] Plaintiffs do not elaborate on how the anti-assignment provision is hidden or cite any case law suggesting that its placement in the SPD would prevent the clause from being enforced. (*See* Dkt. No. 45-5, at 18).

sufficient to [satisfy an] extraordinary circumstances requirement as well." *Paneccasio v. Unisource Worldwide, Inc.*, 532 F. 3d 101, 109 (2d Cir. 2008) (internal quotation marks and citation omitted).

Here, Plaintiffs state that Defendant "engaged in an extensive two-way dialogue with the Provider Plaintiffs and Heffernan without ever once objecting to the assignment," and "that prior to performing the surgery, the Physician Plaintiffs communicated directly with [Defendant], who authorized the procedure, confirmed the benefits under the Plan and provided that the reimbursement rate was calculated based on the 70th percentile of the FAIR-Health database." (Dkt. No. 45-5, at 18). Plaintiffs argue that these facts demonstrate that "the Physician Plaintiffs have satisfied their burden to enforce the benefits of Heffernan's Plan." (Dkt. No. 45-5, at 18).

As Defendant correctly explains, (*see* Dkt. No. 49, at 8 (quoting *Beth Israel Med. Ctr.*, 448 F.3d at 585)), a failure to object is not enough to constitute waiver, *see also e.g.*, *Neurological Surgery, P.C.*, 243 F. Supp. 3d at 330 ("Mere silence regarding the anti-assignment provisions does not constitute a waiver of those provisions"). With respect to the calls themselves, Plaintiffs do not cite to any evidence demonstrating that Defendant waived the anti-assignment provision. (Dkt. No. 45-5, at 18). The Court has additionally reviewed the only evidence in the record indicating that a call between Dr. Tindel's practice and Defendant took place prior to Heffernan's surgery. That call, occurring on August 12, 2019, does not reflect that Defendant waived the anti-assignment provision, or even discussed the anti-assignment provision on the call. (*See* August 12, 2019 Recording).[13] Therefore, Plaintiffs have failed to show that there is a genuine issue of material fact regarding the enforceability of the anti-

---

[13] Plaintiffs also do not explain why authorizing the procedure or confirming Heffernan's benefits would constitute waiver of the *anti-assignment* provision. (*See* Dkt. No. 45-5, at 18).

assignment provision and the Court finds that it prevents Heffernan from assigning his claims to the Provider Plaintiffs.

### B.      Denial of Benefits

#### 1.      Standard of Review

##### a.      Abuse of Discretion

While "ERISA does not itself prescribe the standard of review for challenges to benefit eligibility determinations," "[t]he Supreme Court . . . has indicated that plans investing the administrator with broad discretionary authority to determine eligibility are reviewed under the arbitrary and capricious standard." *Celardo v. GNY Automo. Dealers Health & Welfare Trust*, 318 F.3d 142, 145 (2d Cir. 2003) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)); *see also McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 130 (2d Cir. 2008) ("[I]n cases in which an abuse of discretion standard of review applies, because written plan documents confer upon a plan administrator the discretionary authority to determine eligibility, we will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious." (internal quotation marks omitted) (quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995))). "Under the arbitrary and capricious standard of review, [a court] may overturn a decision to deny benefits only if it was 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Pagan*, 52 F.3d at 442 (citation omitted); *see also Jordan v. Ret. Comm. of Rensselaer Polytechnic Inst.*, 46 F.3d 1264, 1271 (2d Cir. 1995) ("The question before a reviewing court under this standard is whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." (internal quotation marks omitted) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 285 (1974))).

Here, the SPD states that "[b]enefits under this Plan shall be paid only if the Claims Administrator decides in its discretion that a Covered Person is entitled to them." (R. 127). The parties agree that the decision to deny benefits should be evaluated under an abuse of discretion standard. (*See* Dkt. No. 39-1, at 8; Dkt. No. 45-5, at 11).

### b.    Evidence Considered

 "Generally, a court's review of an ERISA claim under the arbitrary and capricious standard is limited to evidence in the administrative record, but the court does have discretion to admit evidence outside the record upon a showing of 'good cause.'" *Puri v. Hartford Life & Acc. Ins. Co.*, 784 F. Supp. 2d 103, 105 (D. Conn. 2011) (quoting *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 631 (2d Cir. 2008)). "The proponent bears the burden to allege facts, with sufficient specificity, that would support the existence of good cause permitting the admission of additional evidence beyond the administrative record." *Purcell v. Scient Fed. Credit Union Split Dollar Agreement Plan*, No. 22-cv-961, 2023 WL 3259985, at *6, 2023 U.S. Dist. LEXIS 77807, at *20 (D. Conn. May 4, 2023) (internal quotation marks omitted) (quoting *Krizek v. Cigna Grp. Ins.*, 345 F.3d 91, 98 n.2 (2d Cir. 2003)).

Plaintiffs argue that "the New York Times article, the transcripts of the audio recordings, and the email exchanges are all outside of the administrative record and cannot be considered in connection with the ERISA benefits claims, without [Defendant] demonstrating good cause." (Dkt. No. 45-5, at 10). First, as previously stated, the September 24, 2019 call is part of the administrative record and so the Court may appropriately consider the audio recording of the call. With respect to the New York Times article, the email chain, and the August 12, 2019, and August 22, 2019 call recordings (and their corresponding transcripts), Defendant has not provided any facts or argument regarding good cause and thus has failed to meet its burden.

Consequently, the Court will not consider those documents with respect to Heffernan's ERISA claim.

### 2.    Application

Plaintiffs argue that it was an abuse of discretion to partially reimburse Heffernan, rather than reimburse him for the total billed charges. (*See* Dkt. No. 45-5, at 11–16). Under Plaintiffs' theory, Heffernan's surgery was an Emergency Service, and the Allowed Charge for the service should have been the full billed charge, rather than the rate provided for out-of-network providers outside the service area of the Plan. (*Id.*). Plaintiffs also argue that the decision lacks explanation of how it considered certain evidence and ignored Dr. Tindel's findings. (*Id.* at 13–14, 16). Defendant takes the position that the benefits determination was proper, arguing that the evidence indicates that the surgery was not an emergency service, (Dkt. No. 39-1, at 9–12; Dkt. No. 49, at 9–13), and that Defendant "explained the basis for its computation of reimbursement for Heffernan's surgery," (Dkt. No. 49, at 13–15).

Benefit determinations that are based on "reasoned, rational interpretation[s]" of plan provisions will be upheld. *See Jeffrey Farkas, M.D., LLC v. Cigna Health and Life Ins. Co.*, 386 F. Supp. 3d 238, 246 (E.D.N.Y. 2019); *see also Zarringhalam v. United Food and Comm. Workers Int'l Union Local 1500 Welfare Fund*, 906 F. Supp. 2d 140, 156 (E.D.N.Y. 2012) ("If 'both the trustees [of an ERISA plan] and a rejected applicant offer rational, though conflicting, interpretations of plan provisions, the trustees' interpretation must be allowed to control.'" (quoting *Miles v. N.Y. State Teamsters Conf. Pension & Ret. Fund. Emp. Pension Benefit Plan*, 698 F.2d 593, 601 (2d Cir. 1983))). Examining the administrative record, the Court agrees with Plaintiffs that it "reveals absolutely no discussion or analysis during the claims adjudication or appeal process of the Tindel operative report, or, more importantly, whether, based on this report, the services provided to Heffernan met the Plan's definition of Emergency Services to

treat an Emergency Medical Condition." (Dkt. No. 45-5, at 13). The EOBs regarding the provision of surgery services do not indicate how the services were classified, other than that the providers are out-of-network. (*See* R. 374–81, 390–97, 404–11). In response to Drs. Mu and Tindel's first level appeals of the benefits determinations (which specifically explained that the services provided were emergency services, (*see* Pl. R. 24–28, 72–87)), Defendant sent a letter upholding the determinations without any explanation of why the services were not considered to be Emergency Services, instead merely explaining the typical (i.e., non-emergency) computation rate for these services when provided by an out-of-network provider, (*see* R. 30–32). After Dr. Mu filed a second level appeal, again explaining that the services provided were emergency services, (*see* Pl. R. 102–10), Defendant's letter upholding the determination did not address the services' classification and provided no more information than its first letter, (*see* R. 35–37).

With respect to the initial consultation with Dr. Tindel, the EOB lists "Emergency Services" under the "Description of Service," but does not cover the full charge, nor does it explain why the charges were not billed at the rate for Emergency Services under the Plan. (*See* R. 404–11). And as with the other responses to the appeals, Defendant's letter upholding the benefits determination did not explain why the "emergency room services" were not considered Emergency Services and thus fully covered. (*See* R. 12–14).

Defendant argues that it "explained the basis for its computation of reimbursement for Heffernan's surgery." (Dkt. No. 49, at 13–15). But while Defendant did explain how the claims were computed, none of Defendant's responses addressed the relevant decision—i.e., the decision not to consider the services Heffernan received to be Emergency Services under the SPD—which then determined the computation rate. Without any reason provided, it is impossible for the Court to evaluate "whether the decision was based on a consideration of the

relevant factors." *Jordan*, 46 F.3d at 1271 (citation omitted). Accordingly, the Court finds that the determination was an abuse of discretion.

### 3.    Remedy

Defendant requests that "[i]n the event the Court determines that [Defendant] should have provided further analysis of the record, the Court should remand the claim to [Defendant] for reconsideration." (Dkt. No. 49, at 17). The Second Circuit has stated that remand for reconsideration is the typical remedy for an abuse of discretion, unless the Court "conclude[s] that there is no possible evidence that could support a denial of benefits." *Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 490 (2d Cir. 2013) (quoting *Miller v. United Welfare Fund*, 72 F.3d 1066, 1074 (2d Cir. 1995)). Here, there is evidence in the administrative record that could support a finding that Heffernan did not receive Emergency Services on August 20 and August 21, 2019. (*See* September 24, 2019 Recording at 9:44–11:21; *see also* R. 65; August 12, 2019 Recording). The Court therefore agrees with Defendant that remand for reconsideration is the appropriate remedy in this instance.

### C.    Implied-in-Fact Contract

Plaintiffs contend that Defendant made "promises of coverage and payment to the Provider Plaintiffs in advance of providing services to Heffernan," allowing them to recover the entirety of their billed charges. (Dkt. No. 45-5, at 19–20).  Defendant responds that no such promises were made prior to or after Heffernan's surgery. (*See* Dkt. No. 39-1, at 12-13; Dkt. No. 49, at 15–17).

"Under New York law, [a]n implied contract, like an express contract, requires consideration, mutual assent, legal capacity and legal subject matter." *Koeller v. Numrich Gun Parts Corp.*, 675 F. Supp. 3d 260, 271 (N.D.N.Y. 2023) (internal quotation marks omitted) (quoting *Sackin v. TransPerfect Glob., Inc.*, 278 F. Supp. 3d 739, 750 (S.D.N.Y. 2017)). "The

element of mutual assent . . . must be inferred from the facts and circumstances of each case, including such factors as the specific conduct of the parties, industry custom, and course of dealing." *Id.* (quoting *Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 376 n.5 (2d Cir. 2000)).

Defendant states that "[t]here is no evidence that [Defendant] agreed to pay the Providers' Billed charges for Heffernan's surgery." (Dkt. No. 39-1, at 13). Plaintiffs argue that Defendant in its statement of material facts admitted one of its representatives "made a representation to Provider Plaintiffs regarding coverage, and agreed to pay for those services upon submission of the Provider Plaintiffs' bill for those services." (Dkt. No. 45-5, at 19 (citing Dkt. No. 39-2, ¶ 15[14])). However, nowhere does Defendant admit to agreeing to pay for Provider Plaintiffs' services in the cited paragraph and the paragraph explicitly states that "Heffernan's surgery was not discussed on the [August 12, 2019] call." (*See* Dkt. No. 39-2, ¶ 15). While Defendant does admit that on the August 12, 2019 call, its representative "mistakenly stated that reimbursement for out-of-network providers is calculated using 'usual and customary rates,'" (*id.*), Plaintiffs do not explain how this statement could constitute assent to fully cover Providers' costs for the surgery and services Heffernan received on August 20 and 21. (*see* Dkt. No. 45-5, at 19–20. The Court has additionally reviewed the August 12, 2019 Recording and confirmed there was no discussion of the services Plaintiffs seek reimbursement for here, and thus Defendant could not have agreed to pay for those services. (*See* August 12, 2019 Recording.).

Plaintiffs also state that "the surgery was authorized," (*id.* at 19 (citing Dkt. No. 45-2, ¶ 24)), as indicated by an authorization letter sent from Defendant to Heffernan on September 24,

---

[14] Defendant's statement of material facts contains two paragraphs numbered 15. (*See* Dkt. No. 39-2, at 6). The Court refers here to the first paragraph with this number.

2019, (*see* Dkt. No. 45-2, ¶ 14). But, while the September 24, 2019 letter does approve

Heffernan's "inpatient, Medical stay . . . for 5 days from August 20, 2019 through August 24,

2019," it specifies that "this approval certifies the appropriateness of the care and services" but

"[i]t is not, however, a guarantee of coverage." (R. 311). And, as Defendant explains, "contrary

to Plaintiffs' argument, Plaintiffs' response to [Defendant's] statement of material facts concedes

that the letter did not promise that Heffernan's surgery would be covered, as an emergency

procedure or otherwise, or that [Defendant] would pay the Providers' full billed charges." (Dkt.

No. 49, at 17 (citing Dkt. No. 45-1, ¶ 26)). Accordingly, the Provider Plaintiffs have failed to

raise a genuine issue of material fact regarding the existence of an implied-in-fact contract and

their claim resting on this theory necessarily fails.

## V.     CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant's motion for summary judgment, (Dkt. No. 39), is

**GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that Plaintiffs' motion for summary judgment, (Dkt. No. 45), is **GRANTED**

**in part** and **DENIED in part**; and it is further

**ORDERED** that the Provider Plaintiffs' claims under ERISA and for breach of implied-

in-fact contract are **DISMISSED**; and it is further

**ORDERED** that Heffernan's claim for denial of benefits be **REMANDED** to Defendant

for reconsideration; and it is further

**ORDERED** that the Clerk of Court is directed to close this case.

**IT IS SO ORDERED.**

Dated: <u>September 16, 2024</u>
      Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge